UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

Wallace S. Nolen,

                                    Plaintiff,

                                                                    **Hon. Hugh B. Scott**

                    v.                                                  02CV499
                                                                        (Consent)

                                                                    **Decision & Order**

Glenn S. Goord et al.,
                                                Defendant.

_____


        Before the Court is the defendants' motion  for summary judgement  (Docket No. 60).


                                    **Background**

        The plaintiff commenced this action in the Northern District of New York by filing a *pro*

*se* complaint (Docket No. 1).[1]   The seven-page typed complaint filed by the plaintiff alleged two

primary claims: (1) that the defendants failed to protect him from assault by other inmates in

violation of the Eighth Amendment to the United States Constitution while he was incarcerated

_____

        [1]  The original complaint named the following defendants: Glenn Goord, George Bartlett,
Floyd Bennett, Anthony Annucci, Dr. Lester Wright, Stephen Bernardi, and "John Does" and "Jane
Does." (Docket No. 1). Robert Murphy, Donald Selsky and Wayne Strack were identified as "John
Does." On April 30, 2003, the Court dismissed the complaint as against Robert Murphy, Donald
Selsky and Wayne Strack. (Docket No. 17).  The Amended Complaint names the same defendants
as the original complaint. (Docket No. 34).

                                          1

at the Elmira Correctional Facility ("Elmira")(Docket No. 1 at ¶ 15, 24); and (2) that the defendants were deliberately indifferent to the plaintiff's serious medical needs resulting from his "severe obstructive apnea" (Docket No. 1 at ¶¶ 40-46).[2]

On January 5, 2004, David Seeger, Esq. filed a Notice of Appearance to represent the plaintiff in this matter. (Docket No. 22).  It appears that no discovery was conducted in the ensuing months.  The docket in this matter does not reflect any further substantive activity in the matter until a motion to amend the complaint was filed on December 30, 2004.  (Docket No. 29).[3]  The proposed Amended Complaint follows the plaintiff's original complaint, *virtually verbatim*, only adding a due process claim and modifying the *ad damnum* clause. (Docket No. 34 at ¶¶ 52-59). On June 29, 2005, an Order was issued granting the motion to amend the complaint.

_____

[2]  The original complaint, drafted by the plaintiff *pro se*, when read liberally also suggests that the plaintiff was asserting a separate albeit somewhat novel claim based upon allegations that the defendants repeatedly transferred him because he exercised his right to file complaints and grievances (Docket No. 1 at ¶¶ 18-22). Based upon the plaintiff's response to the instant motion, as well as other pleadings, it appears that the plaintiff's allegations regarding the frequency of his transfer is asserted as support for his failure to protect claim, not as a separate claim. (Docket No. 76). In that document, the plaintiff states that he has raised two claims: failure to protect and deliberate indifference to medical needs. (Docket No. 76 at ¶ 2).  The original complaint, which was largely repeated in the Amended Complaint, also appears to suggest that some of the defendants conspired with inmates, or themselves, assaulted the plaintiff or committed arson (Docket No. 1 at ¶ 24) and that the conditions of his confinement were unsanitary and otherwise intolerable (Docket No. 1 at ¶ 36).  The plaintiff does not articulate any basis whatsoever to support the allegations of assault or arson directly by corrections officers or the conspiracy on the part of corrections officers with inmates to commit arson or assault.  In any event, it appears that these additional claims have been abandoned as independent claims.  The Court notes that these allegations have not been pursued as independent claims and are not mentioned by the plaintiff's counsel when stating the nature of the plaintiff's claims in response to the instant motion (Docket No. 71) or in other papers filed with the Court. (Docket Nos. 32-2 at ¶ 7; 42-2 at ¶ 2; 56-2 at page 1-2).

[3]  The parties consented to the jurisdiction of a Magistrate Judge on April 29, 2004 (Docket No. 26) and a Scheduling Order was issued by the Court on May 18, 2004. (Docket No. 27).  A pretrial conference was held on December 20, 2004 at which time the desire to amend the complaint was raised by the plaintiff's counsel. (Docket No. 28).

Although the case was approximately two years old, with counsel representing the plaintiff in the case for more than 18 months by that time, it appeared that no written discovery demands had yet been served by the plaintiff and little, if any, discovery had taken place. Thus, in the June 29, 2005 Order, the Court directed the exchange of general information to expedite the discovery process. The Court set August 29, 2005 as the new date for the completion of the parties' own discovery in the matter. (Docket No. 33).

On August 29, 2005, the last day of the discovery period, the plaintiff electronically filed a motion to compel discovery as directed in the Court's June 29, 2005 Order. (Docket No. 41). Counsel for the plaintiff made an error in the electronic filing. The motion to compel was filed again on August 30, 2005. (Docket No. 42). In that motion, the plaintiff did not provide the Court with any specific details as to a deficiency in the defendants' response to a discovery demand. Indeed, the plaintiff merely referred to the subparagraphs's of the Court's June 29, 2005 Order which directed the exchange of general information and stated that the materials produced by the defendants were "woefully incomplete." (Docket No. 42-2 at page 2). The Court set a briefing schedule with oral argument to take place on September 2, 2005. (Docket No. 43). In response to the motion to compel, the defendants asserted that they complied with the Court's Order, and attached copies of the documents produced in response to the Court's Order. In addition, the defendants noted that counsel for the plaintiff had failed to identify any specific objection to the defendants' disclosure, that plaintiff's counsel failed to advise the defendants' counsel that he believed the disclosure was inadequate and made no attempts to resolve the matter prior to filing a motion to compel. (Docket No. 44 at ¶¶ 13-16). Mr. Seeger failed to appear for oral argument on September 2, 2005. He did not contact the Court to ask for

3

an adjournment or to otherwise explain his inability to attend oral argument.  Plaintiff's counsel's

associate did appear (after counsel's office was contacted by the Court) but was not able to

provide the Court with any information as to the basis of the motion.  Based upon this record, on

September 2, 2005, the plaintiff's motion to compel was denied. (Docket No. 46).

   Plaintiff's counsel did not file a motion for reconsideration or for an extension of the

discovery period.  On September 9, 2005, the defendants filed a motion to dismiss based upon

the plaintiff's failure to provide the defendants with authorizations to obtain medical records in a

timely manner.  (Docket No. 47).  On October 20, 2005, the plaintiff filed a motion to strike the

defendants' answers based upon a failure to provide discovery regarding the plaintiff's inter-

facility transfers prior to the June 22, 1999 incident.[4]   Although the Court determined that the

plaintiff did not provide the defendants with medical authorizations in a timely manner, the Court

declined to dismiss the Amended Complaint or to otherwise impose sanctions. (Docket No. 58).

The Court similarly denied the plaintiff's motion to strike.  With respect to the plaintiff's request

for documents relating to the inter-facility transfers, the Court determined that the defendants

need not respond to the request in its entirety.  As stated in the November 9, 2005 Decision &

Order:

> The plaintiff argues that the defendants' failure to provide
> documents relating to events prior to June [22], 1999[5] constitutes a
> violation of the Court's Order.  Primarily, the plaintiff appears to
> seek documentation relating to the multiple transfers of the
> plaintiff between a number of correctional facilities in New York.

---

[4]   It appears that this is the first instance in which the plaintiff provided the Court with a
pleading stating any specific alleged deficiency with respect to the defendants' discovery response.

[5]   In the November 9, 2005 Decision & Order, the Court inadvertently states June 29, 1999
instead of June 22, 1999 as the date of the underlying incident in this case.

4

(Docket No. 56-2 at ¶¶ 4-5).   The plaintiff has not established that the frequency of his transfers between correctional facilities is related to the events of June [22], 1999.  Although the plaintiff alleges the existence of a "conspiracy" to commit arson, assault and other injuries upon the plaintiff involving unnamed "staff" (presumably not the named defendants) at unspecified facilities (Amended Complaint at ¶ 24), the plaintiff has not articulated any factual basis whatsoever with respect to those claims.  The facts relating to the plaintiff's placement in the general population unit in which he was assigned on June [22], 1999 may be relevant to the plaintiff's failure to protect claim.  The plaintiff has not demonstrated that the facts relating to prior placements at other facilities is connected to the events of June [22], 1999.  Thus, to the extent the defendants have not already done so, the defendants are directed to supplement their production with any documents which relate to the decision to place the plaintiff in the unit he was assigned, as well as documents relating to any decision not to provide the plaintiff with protective custody, on June [22], 1999.

Although the plaintiff continues to assert that he has not been provided with discovery regarding his various inter-facility transfers prior to being sent to Elmira, the plaintiff has not advised the Court that the defendants have failed to supplement their disclosure as directed in the November 9, 2005 Order.

Subsequently, the instant motion for summary judgement was filed.

## Standard of Review

Summary judgment is appropriate where there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law.  See Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F. 2d 186, 188 (2nd Cir. 1992) citing Bryant  v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  The court must draw all reasonable inferences in favor of the nonmoving

party and grant summary judgment only if no reasonable trier of fact could find in favor of the

nonmoving party. See Taggart v. Time Inc., 924 F.2d 43, 46 (2d Cir.1991); Howley v. Town of

Stratford, 217 F.3d 141 (2nd Cir. 2000). However, the non-moving party must, "demonstrate to

the court the existence of a genuine issue of material fact." Lendino v. Trans Union Credit

Information, Co., 970 F.2d 1110, 1112 (2nd Cir. 1992), citing Celotex Corp. v. Catrett, 477 U.S.

317, 324 (1986).  A fact is material:

> when its resolution would "affect the outcome of the suit under the
> governing law" and a dispute about a material fact is genuine "if
> the evidence is such that a reasonable jury could return a verdict
> for the non-moving party."

General Electric Company v.  New York State Department of Labor, 936 F.2d 1448, 1452 (2nd

Cir. 1991), quoting Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "The non-

moving party must come forward with enough evidence to support a jury verdict ... and the ...

motion will not be defeated merely ... on the basis of conjecture or surmise." Trans Sport, supra,

964 F.2d at 188, quoting Bryant v.  Maffucci, supra.  If undisputed material facts are properly

placed before the court by the moving party, those facts will be deemed admitted, unless they are

properly controverted by the nonmoving party."  Glazer v. Formica Corp., 964 F.2d 149, 154

(2nd Cir. 1992), citing Dusanenko v. Maloney, 726 F.2d 82 (2nd Cir. 1984).  The Court's

responsibility in addressing a summary judgment motion is identifying factual issues, not

resolving them.  See Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 528 (2nd Cir.

1990). However, summary judgment is appropriate "[w]here the record taken as a whole could

not lead a rational trier of fact to find for the non-moving party." Nippon Fire & Marine Ins. Co.,

Ltd. v. Skyway Freight Systems, Inc., 235 F.3d 53 (2nd Cir. 2000) quoting Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

6

**Plaintiff's Failure to Comply with Rule 56**

In compliance with Rule 56.1 of the Local Rules for the Western District of New York, the defendants filed a Statement of Undisputed Facts (Docket No. 68) along with the instant motion.  The rules require that the nonmoving party file a responding statement of material facts identifying those facts which the nonmoving party contends are disputed.  Specifically, Rule 56.1 states:

> **(b)** The papers opposing a motion for summary judgment shall include a separate, short, and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

> **(c)** All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

The plaintiff has failed to file a statement identifying the disputed facts as required by Rule 56.1.  Thus, the Court may consider the facts set forth in the defendants' Statement of Undisputed Facts (Docket No. 68) as being admitted by the plaintiff.

**Failure to Protect**

On June 22, 1999, Nolen was attacked by at least two inmates at Elmira.  It appears that a razor type instrument was used to cut him in several places, including a long cut along his throat approximately 12 inches in length.  Nolen was able to identify one of his attackers as an inmate named Peter Breslin (Docket No. 44, Exhibit A at 000003).  It is undisputed that Nolen received immediate medical attention regarding his injuries from this attack.  Following this attack, the

plaintiff refused voluntarily transfer into protective custody and was placed in involuntary protective custody ("IPC"). (Docket No. 44, Exhibit A at 000012, 000021).

The plaintiff claims that the defendants failed to protect him from an attack that took place on June 22, 1999 in violation of both the Fifth, Eighth and Fourteenth Amendments.   The defendants contend that the plaintiff has failed to demonstrate that any of the named defendants had personal involvement in the attack or had any prior knowledge of a threat against the plaintiff.

It is settled that, under the Eighth Amendment, "prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994) (quoting Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir.1988)). In Farmer, the Supreme Court set out the two-pronged test that determines when a failure to protect a prison inmate from assault by other inmates rises to the level of a constitutional violation. First, the prisoner must have been "incarcerated under conditions posing a substantial risk of serious harm." Id. at 834. Second, the prison official must have shown "deliberate indifference" to the prisoner's safety. Id. Deliberate indifference exists when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837; Hines v. Lacy, 189 F.3d 460 (2d Cir. 1999).  It is equally well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994). Plaintiff must allege a "tangible connection between the acts of a defendant and the injuries suffered." Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986). The

doctrine of *respondeat superior* is not applicable to § 1983 actions brought against prison officials.  Monell v. Dep't of Social Serv. of New York, 436 U.S. 658, 692 (1978); Bass, 790 F.2d at 263. Thus, the mere fact that a defendant may have been in a "high position of authority is an insufficient basis for the imposition of personal liability" under § 1983. McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977); *see also* Wright, 21 F.3d at 501. There are a number of ways in which a defendant in a supervisory position may be found personally involved in, and therefore liable for, constitutional violations, including: (1) direct participation, (2) failure to remedy a wrong after learning of it, (3) creation or tolerance of a policy under which unconstitutional practices occurred or were allowed to continue, or (4) gross negligence in managing subordinates who committed the violations. Wright, 21 F.3d at 501 (citations omitted); Doyle v. Coombe, 976 F.Supp. 183, 191-192 (W.D.N.Y.1997), *aff'd* 159 F.3d 1346, 1998 WL 537066 (2d Cir.1998); Shell v. Brzezniak, 365 F.Supp.2d 362 (2005), 373 -374 (W.D.N.Y.,2005).

The Court must determine whether a question of fact exists as to any personal involvement of defendants Annucci, Bartlett, Bernardi, Goord or Bennett regarding a threat to Nolen's safety prior to June 22, 1999.

It is not alleged that any of the defendants were present at the time of the plaintiff's attack on June 22, 1999.  It appears that only Bennett was even located at the Elmira facility.

<u>Annucci</u>

Defendant Annucci is a Deputy Commissioner and Counsel for the New York State
Department of Correctional Services ("DOCS"). Nolen alleges, generally, that all the defendants
were aware of his various complaints regarding a "widespread conspiracy" to injure him. (Docket
No. 34 at ¶16).   The sole specific allegations in the Amended Complaint against Annucci state:

> 26.    The Defendants Goord, Bartlett, Annucci and Bernardi knew or should have
> known based upon prior complaints, reports etc., that not only did such prisoners
> who assaulted Plaintiff were such serious and known risk to not only Plaintiff, but
> upon information and belief, all other prisoners, all other prisoners similarly
> situated.

> 27.    The Defendants Goord, Bartlett, Bennett, Annucci and Bernardi each knew that
> there existed at the time of the June 22, 1999 incident a very serious risk of
> injuries to prisoners due to the large number of weapons possessed by a large
> majority of the prisoners at the Elmira Correctional Facility and should have
> known that the Plaintiff was an "at risk" prisoner in need of Protective Custody
> status, or at the very least placement with other known non-violent prisoners.

The plaintiff has failed to demonstrate that Annucci had any personal knowledge of a risk
or threat to Nolen.  In a Declaration dated January 6, 2006, Annucci attaches copies of
correspondence drafted by Annucci or copied to him with respect to any of the plaintiff's claims
in this case. The Court notes the several items are dated as far back as 1996 and are not limited to
correspondence relating to the 1999 incident.  (Docket No. 61).  The correspondence does not
include a single reference to Nolen being subject to any threat to his safety, specifically or in
general. (Docket No. 61).

In response to the instant motion, plaintiff has failed to point to any item of evidence
suggesting that Annucci was aware of any threat to Nolen's safety.  The plaintiff points only to

the fact that subsequent to the June 22, 1999, a June 24, 1999 document suggests that an unscheduled transfer of Nolen might be appropriate. This document notes that a transfer is recommended due to an "unknown enemy(s)" and that Nolen has a history of "anti-social behavior" and of "alienating inmates" at various facilities. (Docket No. 71-4). This post-incident document does not establish that Annucci, or any of the defendants in this case, had knowledge of a threat to Nolen prior to the June 22, 1999 incident.

Bartlett

Bartlett is also a Deputy Commissioner of DOCS. Again, Nolen asserts generally that Bartlett became aware of threats against him (Docket No. 34 at ¶ 16). The sole specific allegations in the Amended Complaint against Bartlett are those in paragraphs 26 and 27 quoted above. In a Declaration dated December 28, 2005, Bartlett attaches copies of correspondence drafted by him or copied to him with respect to any of the plaintiff's claims in this case. The Court notes the several items are dated as far back as 1996 and are not limited to correspondence relating to the 1999 incident. The correspondence does not include a single reference to Nolen being subject to any threat to his safety, specifically or in general. (Docket No. 62).

Once again, the plaintiff has failed to point to any evidence suggesting personal involvement or knowledge on the part of Bartlett of any threat to Nolen prior to June 22, 1999.

Bernardi[6]

Defendant Bernardi is another Deputy Commissioner of DOCS.  As was the case with respect to defendants Annucci and Bartlett, Nolen asserts generally that Bernardi became aware of threats against him (Docket No. 34 at ¶ 16).  The sole specific allegations in the Amended Complaint against Bernardi are those in paragraphs 26 and 27 quoted above.  In a Declaration dated December 30, 2005, Bernardi attaches the limited correspondence drafted by him or copied to him with respect to any of the plaintiff's claims in this case. The documents are dated in March and April of 1999 and deal with issues relating to legal mail and his access to the courts, and medical issues causing him sleep deprivation.   The correspondence does not include a single reference to Nolen being subject to any threat to his safety, specifically or in general. (Docket No. 64).

Once again, the plaintiff has failed to point to any evidence suggesting personal involvement or knowledge on the part of Bernardi of any threat to Nolen prior to June 22, 1999.

Goord

Defendant Goord is the Commissioner of DOCS.  As Commissioner, Goord states that he receives thousands of letters per year from inmates with various complaints.  The letters are read by one of his secretaries and referred to a deputy commissioner or some other individual for response.  (Docket No. 66 at ¶6).  Goord states that various letters from Nolen were sent to him but that each was referred to another DOCS official for response.  Goord testifies that he has no

---

[6]   The plaintiff misspelled Bernardi's name in the Amended Complaint as "Berardi."

recollection of ever having personally read any of Nolen's correspondence. Further, Good states

that a search of Nolen's inmate file revealed that he did not receive any correspondence from the

plaintiff "with regard to his allegation that he was at risk of assault by other inmates on June 22,

1999, at Elmira or at any time with regard to Elmira or any other facility." (Docket No. 66).

Once again, the plaintiff has submitted no evidence to raise a question of fact as to

Goord's knowledge of or personal involvement in any threat to Nolen prior to June 22, 1999.


Bennett

Bennett was the Superintendent of Elmira at the time of the June 22, 1999 incident. Once

more, Nolen asserts generally that Bennett became aware of threats against him (Docket No. 34

at ¶ 16).  The sole specific allegations in the Amended Complaint against Bennett are those in

paragraphs 26 and 27 quoted above.  In a Declaration dated December 30, 2005, Bennett states

that Nolen was placed in IPC after the June 22, 1999 incident and that Bennett recommended that

Nolen be placed in Administrative Segregation for his safety on July 2, 1999.  Nolen remained in

Administrative Segregation until his release from Elmira on November 9, 1999.  (Docket No. 63

at ¶¶ 14-19). Bennett states that the complaints made by Nolen, both before and after the June 22,

1999 attack, make no mention of any threat to Nolen by other inmates (or corrections staff).

(Docket No. 63 at ¶ 21, citing to documents attached to Docket No. 44 as Exhibit A, 000074 to

000126).  A review of these documents reveals that Nolen did not advise Bennett that he was at

risk due to any threat by other inmates or staff prior to the June 22, 1999 incident. Indeed, a

grievance dated June 21, 1999, the day before the incident, Nolen complained that his cell door

13

was "cracked" [opened] at about 3:30pm even though he did not "put in for rec" [recreation].

However, Nolen did not complain that the opening of his cell door put him at physical risk, but

instead argued that it "permitted an opportunity for theft of prisoner property to take place and

serves no penological purpose." (Docket No. 63, Exhibit A, 000103).[7]  Further, a memo drafted

by Nolen dated June 28, 1999, just six days after the attack, concerns issues relating to access to

postage and information regarding the names and addresses of "members of the news media."

(Docket No. 44, Exhibit A, 000079).

The plaintiff has failed to point to any evidence suggesting personal involvement or

knowledge on the part of Bennett of any threat to Nolen prior to June 22, 1999.


Wright

Dr. Wright is a Deputy Commissioner and Chief Medical Officer of DOCS.  It is unclear

from the Amended Complaint as to whether Nolen intended to assert the failure to protect claim

against Dr. Wright. In any event, Dr. Wright states that he has no recollection of Nolen but that a

review of inmate correspondence maintained by DOCS revealed that he was copied on two

pieces of correspondence which are attached to his January 3, 2006 Declaration. (Docket No. 67).

Neither document deals in any way with any threat of attack to Nolen.  The plaintiff has

---

[7]  It appears that cell doors are opened for inmates wishing to attend "rec" from 3:30 to 4:30 pm. "If at 3:25 pm, an inmate's cell is opened and this inmate does not wish to attend the hour rec. program, he is told to lock back into his cell and the cell locking handle is marked so that every one who opens that lock box knows he is in his cell." (Docket No. 63, Exhibit A, 000110).

presented no evidence suggesting personal invlovement or knowledge on the part of Dr. Wright

of any threat to Nolen prior to June 22, 1999.


Plaintiff's Response to the Instant Motion

Perhaps because of an inability to point to any document demonstrating direct knowledge

of or personal involvement on the part of the defendants with respect to an actual and specific

threat to the plaintiff, Nolen suggests that the defendants' culpability is based upon a number of

factors: (1) the fact that he is disliked by the prison administration because he files numerous

grievances [Nolen claims that he is a trained paralegal who has filed numerous complaints and

has provided "jailhouse lawyer advice" to other inmates on "hundreds" of occasions  (Docket

No. 76 at ¶¶ 20-38); (2) that he had suffered a number of prior assaults against him [Nolen claims

that he has been attacked approximately 35 to 40 occasions; that he has reported about 15 to 20

of these attacks; and that about 5 or 6 occasions he has required some medical treatment due to

the attacks] (Docket No. 76 at ¶¶ 39-55); (3) his race [Nolen alleges that because he is Caucasian

he is targeted by African American and Hispanic inmates](Docket No. 76 at ¶¶ 56-60); (4) his

age and physical condition [Nolen claims that his age, 44 at the time of the attack, his overweight

condition made him a target] (Docket No. 76 at ¶¶ 61-62); (5) his snoring [Nolen asserts that his

loud snoring awakens other inmates] (Docket No. 76 at ¶¶ 63-67); (6) the "demeanor" of the

corrections officers at the time [at the time of the attack, the corrections officers were "clustered"

at one end of the hallway, instead of spread out at both ends and the middle of the hallway]

(Docket No. 76 at ¶¶ 68-76); (7) transient blocks [Nolen argues that he was housed in a transient

15

block which has a higher incidence of violence] (Docket No. 76 at ¶¶ 80-98); (8) and plaintiff's long history of being placed in IPC [Nolen claims that he was placed in IPC status on at least 8 occasions while in DOCS custody prior to the June 22, 1999 incident]. (Docket No. 76 at ¶¶ 99-117).

Initially, the Court notes that the plaintiff has presented these allegations merely in conclusory form.  In any event, liability for a failure to protect cannot be imposed upon the defendants based upon the imputation of alleged knowledge of a series of speculative factors. A defendant can only be held liable if he "has ***actual*** or constructive notice of a ***specific risk*** to an inmate's safety and fails to take steps to protect the inmate from injury. See Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir.  1989).  Even assuming many of the self-serving allegations of the plaintiff are true, they do not serve to put prison officials on notice of an actual or specific risk to the plaintiff.  The fact that the plaintiff acts as a jailhouse lawyer does not reasonably suggest that Nolen would be subject to an attack by other inmates (irrespective of whether he is disliked by the administration because of his litigious nature).  Similarly, the plaintiff has presented only speculation of a nexus between the plaintiff's race, age, overweight physical condition, snoring or the transient nature of the cell block and any ***actual*** or ***specific*** risk of harm.  Such speculation is insufficient to sustain a failure to protect claim. Demaio v. Coughlin,  1994 WL 714537, at 2  (W.D.N.Y.,1994).  Further, the plaintiff has not articulated any basis whatsoever to impute knowledge of the "demeanor" or "clustering" of the correction officers at the time of the June 22, 1999 incident to any of the defendants in this case.

The fact that the plaintiff alleges that he had been the subject of previous attacks and that he had been placed in IPC on various occasions does not present evidence that these defendants

16

were aware of an actual and specific risk of harm to Nolen.[8]  The plaintiff has not presented any

evidence that the defendants in this case were aware of the number of attacks (or any single

attack) he alleges to have taken place.  The plaintiff does not allege that he has had personal

conversations with any of the named defendants to place them on notice of any threat to him.   As

discussed above, each of the defendants has represented that each has disclosed any

correspondence drafted by them or copied to them with respect to the claims in Nolen's

Amended Complaint.  None of the correspondence suggests that these defendants had knowledge

that Nolen was at risk of assault at Elmira on June 22, 1999 (or any other time, or any other

facility).  (Bernardi, Docket No. 64 at ¶ 4; Bennett, Docket No. 63 at ¶ 28; Bartlett, Docket No.

62 at ¶ 6;   Annucci, Docket No.  61 at ¶ 6; Goord, Docket No. 66 at ¶ 9).[9]

     The plaintiff's argument that he needs further discovery on this issue pursuant to Rule

56(f) lacks merit, particularly in light of plaintiff's failure to diligently pursue discovery in this

matter during the discovery period.  The plaintiff has not articulated a basis to conclude that

further discovery would lead to evidence suggesting personal involvement by the defendants in

this case of an actual or specific threat of harm to the plaintiff.  Moreover, as discussed below, in

light of the plaintiff's March 26, 1999 refusal of protective custody, the plaintiff has failed to

---

[8]  It should be noted that unrelated attacks do not necessarily provide actual or constructive notice of an actual or specific significant risk of harm to an inmate.  Barrett v. United States, 845 F.Supp. 774, 778 (D.Kan.1994)(No liability where prior threats were unrelated incidents).

[9]  Indeed, the plaintiff is deemed to have admitted that the defendants had no personal involvement with respect to Nolen's failure to protect claim inasmuch as the plaintiff has failed to dispute the representations in the defendants' Statement of Undisputed Facts (Docket No. 68 at ¶¶ 7-8; 13-15; 20-22; 51-54; 61-64; 69-71) as required by Local Rule 56.1.

demonstrate how further discovery as to events prior to that time would lead to material evidence regarding the failure to protect claim.

While the record does not reflect that the individual defendants in this matter were aware of the plaintiff's relations with other inmates, it is undisputed that some DOCS officials did offer Nolen the opportunity to enter voluntary protective custody prior to the June 22, 1999 attack. The plaintiff does not dispute that while at the Clinton Correctional Facility he had refused placement in voluntary protective custody ("VPC") on March, 26, 1999 (Defendants' Disclosure Pursuant to November 15, 2005 Order at Exhibit B; Docket No. 76 at ¶ 113). At that time, Nolen stated that he would notify prison officials if he felt he needed protection in the future. (Defendants' Disclosure Pursuant to November 15, 2005 Order at Exhibit B).  Nolen does not even allege that he advised any of the defendants in this case that he felt he needed protection or of any actual or specific threat to him subsequent to his March 26, 1999 refusal of protective custody.  Instead, Nolen argues that his transfer to Elmira moots his March 26, 1999 VPC refusal and that the defendants should have ignored his March 26, 1999 refusal and imposed involuntary protective custody.  This argument fails as a matter of law.  The March 26, 1999 refusal represents Nolen's acknowledgment that was not at risk of harm at that time.  Without pointing to some change in circumstances subsequent to that date, Nolen cannot now point to pre-March 26, 1999 information to support his position that the defendants were aware that he was at risk of harm, but failed to respond in a reasonable manner prior to the June 22, 1999 attack.  Nolen does not point to any piece of evidence subsequent to his March 26, 1999 refusal of VPC which would have put the defendants in this case on notice of an actual or specific threat of harm to him prior to the June 22, 1999 attack. Under these circumstances, the plaintiff's failure to protect claim

18

cannot stand.  Simmons v. Artuz,  1996 WL 233504, *4 (S.D.N.Y.,1996)( Even if the Court

assumes that the plaintiff did write to the defendant after the first attack to alert him to the threat

of the second attack, which was made by a different prisoner for a reason entirely unrelated to the

first attack, there is still insufficient evidence of any violation of plaintiff's rights. Prison officials

who actually knew of a substantial risk to inmate health or safety may be found free from liability

if they responded reasonably to the risk, even if the harm ultimately was not averted. It is

undisputed that plaintiff refused protective custody status. Thus, plaintiff has failed to show that

defendants had the requisite knowledge and culpable state of mind prior to these two attacks to

establish a violation under §1983); Berry v. Sherman,  365 F.3d 631, 632 (8th Cir. 2004)(Inmate

who was assaulted by cellmate, failed to establish that he faced risk of serious harm from

cellmate notwithstanding inmate's previous complaints about cellmate and report from another

inmate that cellmate had knife and planned to use it; officers investigated report by searching cell

for weapon, and inmate had repeatedly rejected opportunity for protective custody).

Based on the above, the plaintiff's claim that the defendants failed to protect him from the

June 22, 1999 attack is dismissed.

**Deliberate Indifference to Medical Needs**

The plaintiff also asserts that the defendants were deliberately indifferent to his medical

needs. More specifically, the Amended Complaint alleges that during the period of June 22, 1999

and November 9, 1999, the defendants failed to provide him with proper medical treatment for "severe obstructive apnea." (Docket No. 34 at 40).[10]

The Eighth Amendment outlaws "cruel and unusual punishments." U.S. Const. amend. VIII. "This includes punishments that 'involve the unnecessary and wanton infliction of pain.' " Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)). See also Hernandez v. Keane, 341 F.3d 137, 144 (2d. Cir. 2003).   While "society does not expect that prisoners will have unqualified access to health care," Hudson v. McMillian, 503 U.S. 1, 9 (1992), an inmate can nevertheless prevail on an Eighth Amendment claim arising out of medical care by showing that a prison official acted with "deliberate indifference" to the inmate's serious medical needs. Hathaway v. Coughlin, ("Hathaway I"), 37 F.3d 63, 66 (2d Cir.1994) (quoting Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).

This standard incorporates both objective and subjective elements. The objective "medical need" element measures the severity of the alleged deprivation, while the subjective "deliberate indifference" element ensures that the defendant prison official acted with a sufficiently culpable state of mind.  Smith v. Carpenter, 316 F.3d 178, 183 -184 (2d. Cir. 2003). To prevail on a constitutional claim of deliberate medical indifference, a plaintiff must prove that he suffered from an objectively serious medical condition, which the defendants knew of and

---

[10]   As an initial matter, the plaintiff claims that the defendants have failed to produce the plaintiff's medical records in this case. (Docket No. 71 at page 4;  Docket No. 76 at ¶ 130).  The defendants, however, represent that they have, in fact, produced approximately 1300 pages of medical records to the plaintiff and have produced cover letters dated and executed declarations of service October 27, 2005 [relating to 000193-001084] and January 23, 2006 [relating to 001085-001505]  (Docket No. 72).   Thus, it appears that one of the parties is making a misrepresentation to the Court as to whether medical records have been produced.

deliberately disregarded. <u>Green v. Senkowski</u>, 2004 WL 1292786, *1 (2nd Cir. 2004) citing

<u>Chance</u>, 143 F.3d at 702 (collecting cases). A serious medical condition is one that may result in

death, degeneration, or "chronic and substantial pain." <u>Id.</u>; see <u>Hathaway I</u>, 37 F.3d at 66. This

standard contemplates a "condition of urgency, one that may produce death, degeneration, or

extreme pain." <u>Nance v. Kelly</u>, 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)). A serious

medical need arises where "the failure to treat a prisoner's condition could result in further

significant injury or the unnecessary and wanton infliction of pain." <u>Chance</u>, 143 F.3d at 702. To

satisfy the subjective prong of the test, prison officials must have acted with a sufficiently

culpable state of mind, i.e., deliberate indifference. Plaintiff must therefore show that prison

officials intentionally denied, delayed access to, or intentionally interfered with prescribed

treatment. See <u>Estelle</u>, 429 U.S. at 104-05. See also <u>Farmer v. Brennan</u>, 511 U.S. 825, 837

(1994)("[A] prison official cannot be found liable under the Eighth Amendment for denying an

inmate humane conditions of confinement unless the official knows of and disregards an

excessive risk to inmate health or safety; the official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

inference."). "[T]he subjective element of deliberate indifference 'entails something more than

mere negligence ... [but] something less than acts or omissions for the very purpose of causing

harm or with knowledge that harm will result." ' <u>Hathaway II</u>, 99 F.3d at 553 (quoting <u>Farmer</u>,

511 U.S. at 835). Accordingly, subjective recklessness can satisfy the deliberate indifference

standard where "the official has actual knowledge that the prisoner faced a substantial risk of

serious harm and disregards that risk by failing to take reasonable measures to abate it." <u>Farmer</u>,

511 U.S. at 847. However, "[m]edical malpractice does not become a constitutional violation

merely because the victim is a prisoner." Estelle, 429 U.S. at 106. Finally, it is well settled that a plaintiff asserting an Eighth Amendment claim based upon inadequate medical care must establish deliberate indifference for each individual defendant against whom the claim is asserted. Brock v. Wright, 315 F.3d 158, 164 (2d Cir.2003)(stating that plaintiff must show deliberate indifference on the part of a "particular defendant").

In the instant case, according to Cheng Yin, M.D., the plaintiff first complained of sleep apnea on May 18, 1999 while incarcerated at the Clinton Correctional Facility.  (Docket No. 65 at ¶ 6).   Nolen was seen by an otolaryngologist and recommended for septoplasty (an operation to correct a deformity of the nasal septum), a sleep study and other treatment. (Docket No. 65 at ¶ 7). On April 8, 1999, Nolen was referred to a pulmonary specialist for a sleep apnea study. (Docket No. 65 at ¶ 12). The study was initially denied as not medically necessary by the HMO contracted by DOCS on April 29, 1999. (Docket No. 65 at ¶ 15.).   On July 29, 1999, Dr. Yin again referred Nolen to the Ear, Nose and Throat ("ENT") Clinic, requesting evaluation for correction of uvula problem. (Docket No. 65 at ¶ 42).   Nolen was seen at the ENT Clinic on August 10, 1999 by Dr. Pathak, who noted the need for a sleep study. (Docket No. 65 at ¶ 43).   A permission form was signed on August 10, 1999 to send the plaintiff to Sharon Hospital for a sleep study. On August 27, 1999, a Uvulopalatopharyngoplasty ("UPPP") and tonsillectomy were approved to address Nolen's apnea. (Docket No. 65 at ¶ 48).   Apparently, surgery was delayed because the sleep study was never performed. (Docket No. 65 at ¶ 51).   Attempts to obtain a copy of Nolen's 1994 sleep study were unsuccessful, and a new sleep study was ordered. (Docket No. 65 at ¶ 59).   Nolen was released from Elmira on November 9, 1999 prior to the scheduling of the sleep study. (Docket No. 65 at ¶ 65).   The record reflects that although things did not progress as

quickly as the plaintiff would like, he was receiving appropriate medical treatment relating to his sleep apnea.  The Court notes that none of the defendants were personally involved in treating Nolen for any medical condition, including the sleep apnea which underlies the instant claim, although Nolen copied several of the defendants with a March 26, 1999 letter complaining of sleep deprivation.  "[T]he fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement" for the imposition of liability under §1983.  *See* Gayle v. Lucas*, 1998 WL 148416, at *4 (S.D.N.Y. 1998); Higgins v. Coombe*, 1997 WL 328623, at *11 (S.D.N.Y. 1997); Thomas v. Coombe,  1998 WL 391143, *6 (S.D.N.Y.,1998); Chavis v. Kienert,  2005 WL 2452150, *11 (N.D.N.Y.,2005).

In any event, a review of the plaintiff's medical record at that time, as discussed above, would have revealed that the plaintiff was being treated by Dr. Yin with respect to his sleep disorder.  The plaintiff has presented no evidence suggesting that any of the defendants played any role in the delay of obtaining a sleep study in his case.  Nolen has not alleged nor presented any evidence that the delay in obtaining the sleep study (and ultimately the UPPP) resulted in a worsening of his condition. WMX Techns., Inc. v. Miller*, 104 F.3d 1133 (9th Cir.1997) (en banc) (stating that where prisoner alleges delay of treatment amounted to deliberate indifference, the prisoner must have evidence that the delay led to further injury); Dawkins v. Jones,  2005 WL 196537, at 15 (S.D.N.Y.,2005)( a delay in medical treatment does not necessarily invoke the Eighth Amendment unless there is evidence that officials deliberately delayed care as a form of punishment; or ignored a "life-threatening and fast-degenerating" condition). The plaintiff has presented no evidence from which a trier of fact could conclude that any of the defendants acted

with any degree of recklessness or malice sufficient to satisfy the subjective burden set forth in

<u>Farmer</u> and its progeny.

In light of the above, the defendants' motion for summary judgment as to the plaintiff's

claim of deliberate indifference to his medical needs is granted.


### Conclusion

Based on the above, the defendants' motion for summary judgment (Docket No. 60) is

granted, and the Amended Complaint in this matter is dismissed in its entirety.  The Clerk of the

Court is directed to enter judgment on behalf of the defendants in this matter and to close this

case.

So Ordered.




            /s/  *Hugh B. Scott*

United States Magistrate Judge
Western District of New York

Buffalo, New York
February 17, 2006